**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOSE LUIS MORALES GODINEZ, Petitioner, v. LEVI HELEM MORALES GODINEZ, Respondent. | Civil Action No. 22-3596 (GC) (DEA) **MEMORANDUM OPINION** |

CASTNER, District Judge

**THIS MATTER** comes before the Court upon Petitioner Jose Luis Morales Godinez's ("Petitioner" or "Godinez") Verified Petition for Return of Children to Mexico ("Petition") (*see* ECF No. 1) under the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001, *et seq.* ("ICARA"), which implements the Hague Convention on the Civil Aspects of International Child Abduction, done at The Hague on Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11 (the "Convention"). Petitioner brings this Petition against Respondent Levi Helem Morales Godinez ("Respondent" or "Morales") seeking the return of their three minor children, J.A., S.D., and E.M., from the United States of America to the United Mexican States ("Mexico").

The Court has carefully considered the parties' submissions, and decides the Petition following the evidentiary hearing conducted on February 17, 2023. (*See* ECF No. 29.) For the reasons outlined below, and for other good cause shown, the Petition is **GRANTED**, and it is **ORDERED** that the children be returned to Mexico.

I.     **BACKGROUND**

A.     **Procedural History**

On June 8, 2022, Godinez filed a Request for Expedited Consideration of his Verified Petition for Return of Children to Mexico and Issuance of Show Cause Order.[1] (*See* ECF No. 1.) On June 24, 2022, this Court entered the Order to Show Cause and set a date for an initial hearing, which was held on July 11, 2022. (ECF Nos. 4 & 7.) The Court requested *pro bono* counsel be appointed on behalf of Morales from the Civil *Pro Bono* Panel, which was done on July 19, 2022. (ECF Nos. 6 & 8.)

On August 26, 2022, Morales moved to dismiss the Petition pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1). (ECF No. 11.) On September 2, 2022, Godinez opposed the motion (*see* ECF No. 14), and on September 19, 2022, Morales replied (*see* ECF No. 17). The Court issued a written opinion denying Morales's motion on October 13, 2022. (ECF Nos. 18 & 19.) As a result, Morales answered the Petition on October 21, 2022. (*See* ECF No. 22.)

Following an initial pretrial conference on November 2, 2022, and a telephone status conference on December 15, 2022, the Court issued a scheduling order setting deadlines for expedited discovery in advance of the anticipated evidentiary hearing. (*See* ECF No. 26.) After the completion of written discovery and depositions (if any), the parties submitted trial briefs in early February 2023. (*See* ECF Nos. 27 & 28.)

On February 17, 2023, the Court conducted an evidentiary hearing, during which it heard testimony from witnesses and reviewed exhibits presented by the parties.[2] (*See* ECF No. 29.) The

---

[1]     This Court has jurisdiction pursuant to 22 U.S.C. § 9003(a).

[2]     In addition to testimony from Petitioner and Respondent (who were both physically present at the hearing), testimony was heard via Zoom from two witnesses called by Petitioner: Erika Gonzalez Gonzalez and Andres Velazquez Marin. (ECF No. 37 at 66:1, 69:21-24.) At the hearing,

Court directed the parties to submit proposed findings of fact and conclusions of law following the hearing. On February 27, 2023, Godinez made his submission (*see* ECF No. 31), and on March 27, 2023, Morales made hers (*see* ECF No. 35).

### B. Findings of Fact

The facts relevant to the disposition of the Petition are largely undisputed. Petitioner Godinez is the father of three minor children born to Respondent Morales. (Stip. ¶ 2.[3]) Those three children are a boy J.A. (age nine), a girl S.D. (age six), and a boy E.M. (age four). (Stip. ¶¶ 6-9; ECF No. 37 at 10:10-17; R-1, R-2, R-5.) All three children were born in Mexico and lived there from their birth until their removal to the United States in December 2021. (*Id.*)

Both Godinez and Morales were employed in Mexico: Godinez as a mechanical engineer and Morales as a school teacher. (ECF No. 37 at 48:10-24, 75:12-17.) Morales earned about 14,000 pesos per month and Godinez about 12,000 pesos per month.[4] (*Id.*) Because of the locations of their jobs, Godinez and Morales were unable to live together after the birth of their first child. In 2013, when J.A. was born, Morales worked at a middle school in the Mexican state

---

the following exhibits were admitted into evidence on behalf of Petitioner and Respondent: Exhibits P-1 through P-5 and P-7 as well as R-1, R-2, R-5, and R-7. (*Id.* at 59:22-23, 62:6-7.) One exhibit, Exhibit P-6, was admitted after the actual hearing concluded but before it closed with the consent of both parties. (ECF No. 34.)

[3]     "Stip." refers to the Proposed Stipulations of Fact that the parties submitted to the Court in hard-copy at the evidentiary hearing, and which the Court accepted on the record. (*See* ECF No. 37 at 6:16-21.)

[4]     Although the exchange rate of course fluctuates, Respondent submitted evidence of the exchange rate in February 2023 that indicates that 14,000 pesos is approximately 800 dollars and 12,000 pesos is approximately 685 dollars. (ECF No. 35 at 17.) Morales also testified that all three children had been on the healthcare provided by her employer. (ECF No. 37 at 75:18-25.)

3

of Guerrero, while Godinez lived with his parents in the Mexican state of Mexico.[5] (*Id.* at 40:25-42:11, 73:1-12.) Thus, during the first three years after J.A.'s birth (from about 2013 through 2016), J.A. primarily lived with Morales near the school that Morales taught at, while Godinez lived about four to five hours away by car. (*Id.* at 41:3-42:11, 73:1-9.) Morales resided during these years at the home of Rena Morales ("Rena") and Raul Baskins, and Morales was responsible for feeding J.A., cleaning the house, and taking care of other parental duties. (*Id.* at 73:3-6, 74:22-75:1.) Morales was assisted during school hours by Rena whom Morales compensated. (*Id.* at 75:2-8.) Despite the distance between Godinez and Morales at the time, they would visit each other "a lot," and Godinez would sometimes send money for the care of J.A., which became regular payments around the end of 2015. (*Id.* at 76:1-9.)

After the birth of their second child, S.D., in 2016, J.A. went to live with Godinez at an apartment Godinez was renting adjacent to where Godinez's parents lived (referred to as "Hidalgo 17"[6]) while Morales remained by her job in the state of Guerrero. (*Id.* at 76:12-23; Stip. ¶ 3.) According to Morales, Godinez took J.A. to live with him in February 2017 against Morales's wishes. (ECF No. 37 at 77:1-6.) As a result, Morales initiated custody proceedings in 2017, which she dropped after Morales and Godinez agreed that the family would all be together in the state of Mexico one day when they figured out the logistics. (*Id.* at 77:7-16.)

After the birth of the third child, E.M., in early 2019, both E.M. and S.D. lived with Morales in the state of Geurrero, while J.A. remained with Godinez at Hidalgo 17. (*Id.* at 79:1-12.) The entire family (both parents and the children) would get together twice a month and during

---

[5] The state of Mexico is a federal entity in the country of Mexico north of the state of Guerrero. (ECF No. 37 at 41:3-5, 74:4-9.)

[6] Godinez has lived at Hidalgo 17 for the past seven years. (ECF No. 37 at 9:11-12, 9:24-25.)

vacations. (*Id.* at 80:2-3.) Morales paid for the care, food, and clothing of S.D. and E.M. while they were with her in Guerrero. (*Id.* at 79:20-24.) When she visited Godinez and J.A. at Hidalgo 17, she would help provide food, cleaning materials, and clothes for J.A. (*Id.* at 80:4-8.)

Then, in August 2019, Morales's job was transferred from Guerrero to a school just twenty minutes from Hidalgo 17. (*Id.* at 80:11-15.) This allowed the whole family to live together consistently at Hidalgo 17 for the first time. (*Id.* at 82:12-17, 87:4-6.) Because of the transfer, Morales did not receive paychecks from August to November 2019, and Godinez loaned Morales money (approximately 28,000 pesos) in order for Morales to support herself and the children. (*Id.* at 80:16-81:3.) Morales paid back the loan to Godinez in November 2019 when she finally received her paycheck that included backpay. (*Id.* at 81:4-6.)

Morales testified that after November 2019, she paid approximately seventy percent (70%) of the financial support for the children, and Godinez paid the other thirty percent (30%) as well as rent on the apartment at Hidalgo 17. (*Id.* at 81:7-18.) Morales testified that she paid Godinez's mother about 1,000 pesos a week to help care for the children. (*Id.* at 82:3-11.) Despite Morales leaving early for work each morning, she retained many parental responsibilities for the children, including cleaning, cooking, washing clothes, and feeding them. (*Id.* at 82:18-23, 83:9-20.) Although Morales acknowledged that Godinez took care of housekeeping "a few times," Morales maintained that normally she was responsible for it. (*Id.* at 83:21-24.)

Godinez testified that while the family was living together at Hidalgo 17 he would "[m]ainly" get the children ready for school and either he or his family members would walk them to school, because Morales had to go to work earlier. (*Id.* at 19:9-20.) Godinez's brothers would assist with picking the children up from school. (*Id.* at 20:4-6.) Godinez testified that Morales was responsible for making dinner and feeding the children, and Godinez would put them to bed.

5

(*Id.* at 20:7-18.) Godinez testified that the "majority of [the] time" he would be the one to take a child to the doctor if they needed to go. (*Id.* at 21:19-23.) Godinez also testified that he would take the children to the park, eat together, do homework, play video games, watch videos, read comic books, and sometimes go to the theater or the cinema. (*Id.* at 23:2-6; *see also* P-3.)

In April 2020, during the early days of the COVID-19 pandemic, Morales and the children briefly relocated from Hidalgo 17 to the home of Morales's parents in the state of Guerrero. (ECF No. 37 at 84:19-25, 87:10-13.) The family reunited at Hidalgo 17 in July 2020. (*Id.* at 87:14-15.)

In November 2020, Morales took the two younger children (S.D. and E.M.) and moved into an apartment about 100 meters from Hidalgo 17, referred to as "Allende 4." (*Id.* at 55:12-17, 88:7-9, 98:18-19; Stip. ¶ 4.) Morales testified that she left for Allende 4 because Godinez had hit her and told her "to get out." (ECF No. 37 at 88:2-9.) This prompted Godinez to initiate custody proceedings that he dropped in April 2021 after the parents reconciled and the entire family returned to Hidalgo 17. (*Id.* at 28:10-13, 29:3-13, 29:22-30:7.) The family then lived together at Hidalgo 17 from approximately May 2021 through December 2021. (*Id.* at 30:8-12.)

Morales testified that she had to visit a hospital for X-rays in July 2021 because Godinez struck her in the back of the head. (*Id.* at 89:12-22.) After being discharged from the hospital, Morales returned to Hidalgo 17, and Godinez made Morales beg before allowing her into the house. (*Id.* at 89:23-90:8.) Morales also testified that Godinez's family members, who were their neighbors at Hidalgo 17, frequently behaved "with irreverence" towards her, sometimes in front of her children. (*Id.* at 89:3-9.) Godinez acknowledged that Morales had filed "a couple . . . reports" related to "domestic violence" against him, but he testified that although there were investigations, they ultimately did not lead to prosecution. (*Id.* at 30:13-23.)

In December 2021, Godinez and Morales agreed that the children would spend some vacation time with the children's maternal grandparents in the neighboring state of Guerrero. (*Id.* at 23:7-21.) Godinez drove the children to their grandparents' home, and Godinez testified that on the day the children were supposed to return, he tried to contact them, and when he finally reached Morales, she told him that she had taken the children and they were with her at the United States-Mexico border. (*Id.* at 23:18-24:3.) Godinez testified that he did not consent to the children being taken to the United States and that he has not seen them in person since December 26, 2021. (*Id.* at 24:6-13.)

During the hearing, Morales did not recall telling Godinez that she would return the children to Hidalgo 17 after the holiday visit to their grandparents. (*Id.* at 101:17-22.) Morales acknowledged, however, that the first time she told Godinez about her plan to take the children to the United States was when Godinez called her and she was already in California. (*Id.* at 105:23-106:2.) Morales testified that one of the reasons she had the children's possessions with her when they went to Guerrero is Morales believed Godinez and his mother wanted her out of their lives. (*Id.* at 91:1-8.)

Since coming to the United States in December 2021, Morales and the three children have lived with Morales's family members in Raritan, New Jersey. Morales testified that the children have been doing well in school there. (*Id.* at 92:25-93:13.) Godinez has communicated sporadically with the children via videoconference only. (*Id.* at 31:10-19.) Morales testified that although she has allowed Godinez to communicate with the children virtually, Godinez blocked her at some point out of anger. (*Id.* at 93:18-25, 94:20-95:7.)

Godinez has sought help from the Mexican authorities to try to compel the children's return to Mexico. (*Id.* at 24:14-15.) He obtained documents from the Mexican Department of Foreign

Relations and brought suit for custody in Mexico in late-January 2022, in the Family Court of Tlalnepantla, state of Mexico, which suit is still pending. (*Id.* at 24:16-25:7, 94:14-23; P-4 & P-5.) In early June 2022, about six months after the children's removal, Godinez initiated the present action in the United States District Court for the District of New Jersey. (ECF No. 1.)

## II.    LEGAL STANDARD/GOVERNING PRINCIPLES

The Hague Convention "was adopted in 1980 in response to the problem of international child abductions during domestic disputes." *Golan v. Saada*, 142 S. Ct. 1880, 1888 (2022) (quoting *Abbott v. Abbott*, 560 U.S. 1, 8 (2010)).[7] It was implemented in the United States by Congress's adoption of ICARA, which "permits a parent (or other individual or institution) seeking relief under the Convention to file a petition for return of a child in state or federal court, and directs courts to 'decide the[se] case[s] in accordance with the Convention.'" *Id.* at 1889 (quoting 22 U.S.C. § 9003(d)).

"Under the Hague Convention . . . , if a court finds that a child was wrongfully removed from the child's country of habitual residence, the court ordinarily must order the child's return." *Id.* at 1887. The reason for this policy is the "'core premise' . . . that 'the interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Id.* at 1888 (quoting *Monasky v. Taglieri*, 140 S. Ct. 719, 723 (2020)).

---

[7]    Over one hundred countries, including the United States and Mexico, are parties to the Convention. *See* Hague Conference on Private Int'l Law, Convention of 25 Oct. 1980 on the Civil Aspects of Int'l Child Abduction, Status Table, https://www.hcch.net/en/instruments/conventions/status-table/?cid=24 (last accessed May 6, 2023). The parties stipulated to the fact that both Mexico and the United States are parties to the Convention. (Stip. ¶ 1.)

"Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained. If the court finds the child was wrongfully removed or retained, the respondent opposing return of the child has the burden of establishing that an exception to the return requirement applies." *Id.* at 1889 (citing 22 U.S.C. § 9003(e)(1)). And "[a]bsent a finding that an exception applies, a child determined to be wrongfully removed or retained must be 'promptly returned' to the child's country of habitual residence." *Id.* (citing 22 U.S.C. § 9001(a)(4)).

Ultimately, the "return requirement is a 'provisional' remedy that fixes the forum for custody proceedings. Upon the child's return, the custody adjudication will proceed in that forum." *Monasky*, 140 S. Ct. at 723 (citing Silberman, Interpreting the Hague Abduction Convention: In Search of a Global Jurisprudence, 38 U. C. D. L. Rev. 1049, 1054 (2005)).

### III. DISCUSSION

#### A. Wrongful Removal Under the Convention

To determine whether a petitioner has established a *prima facie* case of wrongful removal under the Convention, a court generally must answer four questions: (1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her custody rights at the time of removal or retention. *Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010) (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 270 (3d Cir. 2007)). If a petitioner meets his or her initial burden, then "the authority concerned shall order the return of the child forthwith," unless the respondent establishes one of the affirmative defenses enumerated in the Convention. *See* Convention, arts. 12-13; *Karpenko*, 619 F.3d at 263.

Here, the Court finds that Godinez has met his burden of establishing a *prima facie* case of the wrongful removal of the three minor children J.A., S.D., and E.M. from Mexico to the United States.

*First*, it is undisputed that in late-December 2021, after the three children traveled from Hidalgo 17 to the state of Guerrero to spend time with Morales's parents, Morales removed the three children to the United States. (ECF No. 37 at 23:18-24:3.) Morales confirmed during her testimony that she had not sought nor obtained advance consent from Godinez to travel with the children to the United States, and there is no meaningful disagreement as to the timeline. (*Id.* at 105:23-106:2 ("Q: So when did you tell Mr. Godinez that you had taken the children to the United States?  A: When he called me I answered the phone.  Q: And where were you?  A: In California.").)

*Second*, it is evident that the children's country of habitual residence prior to removal was Mexico, not the United States. The United States Supreme Court recently clarified that determining "a child's habitual residence depends on the totality of the circumstances specific to the case" with "[n]o single fact . . . dispositive across all cases." *Monasky*, 140 S. Ct. at 723. The Court also underscored that "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id.* This is one such straightforward case. All three minor children were born in Mexico and lived there continuously with their parents, and attended school there, until Morales decided in December 2021 to remove them to the United States. (R-1, R-2, R-5; ECF No. 37 at 10:10-17, 23:8-24:3.) Morales did not contest these basic facts during the evidentiary hearing and does not now argue that the country of Mexico was not the children's country of habitual residence prior to removal. (ECF No. 35 at 8-10.)

*Third*, because Mexico was the children's country of habitual residence prior to their removal in late-December 2021, the question becomes whether removal to the United States without Godinez's consent violated Godinez's "rights of custody." The Convention defines "rights of custody" broadly to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5(a). These rights "may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." *Id.*, art. 3. The United States Supreme Court has clarified that an inquiry into these rights should keep in mind that one of the Convention's central features is "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (quoting Convention, art. 1).[8]

In the present action, the Court finds that Petitioner has met his burden of proving by a preponderance of the evidence that the removal of the three minor children from Mexico without the father's permission violated his rights of custody under Mexican law. The parties jointly stipulated that Godinez is the biological father of the three children (Stip. ¶ 2), and though Morales and Godinez have lived apart for extended periods (seemingly due to the distance between their jobs), the record supports the conclusion that Godinez never relinquished his custodial rights as to the three children. Indeed, even though Morales initiated custody litigation in 2017, she testified that she chose to dismiss it because it was agreed that the entire family (both parents and the children) would live together in the state of Mexico. (ECF No. 37 at 77:12-16 ("Q: Did you eventually drop that lawsuit? A: Yes, in April. Q: . . . Why did you do that? A: Because we

---

[8] In *Abbott*, the Court held that "rights of custody" include more than just the right of physical custody, but can include a *ne exeat* right, which is a right requiring a father's consent prior to a child's removal. *Abbott*, 560 U.S. at 11.

11

agreed that one day we would all be together in the State of Mexico.").) Similarly, even though Godinez initiated custody litigation in 2020, it was dropped because Godinez and Morales agreed to reconcile and live together with their children at Hidalgo 17, which they did from May 2021 until the children's removal in December 2021. (*Id.* at 29:22-30:12, 88:10-16.)

Notably, while the 2020 custody litigation was pending, the First Family Court of Tlalnepantla, in the state of Mexico, entered a provisional order on or about December 1, 2020, which set forth that (pending a final hearing) E.M. and S.D. would stay with Morales at Allende 4 and J.A. would stay with Godinez at Hidalgo 17. (P-6; ECF No. 30 at 5-6.) The order detailed visitation days/times and rights, and cautioned the parties "that if they do not comply with the decreed regime of paternal-filial cohabitation, . . . the custody and guardianship of the descendant in their care will be withdrawn and the paternal-filial cohabitation will be modified accordingly." (*Id.*) The provisional order supports the inference that the Mexican court did not view either parent as having sole and unilateral authority over all of the children and, instead, viewed custody as a contested matter that would need to be resolved pending a final hearing, which apparently never took place.

In view of the above, the Court believes that the parties' actions – agreeing at various points to drop custody litigation and to jointly raise their children in the same location – as well as the provisional order from the First Family Court of Tlalnepantla all point toward the conclusion that Godinez had some degree of custody rights as to the three children under Mexican law. The record certainly does not support the opposite conclusion that Morales had sole custodial authority under Mexican law to dictate with whom and where her and Godinez's three children should live. *See Flores Castro v. Hernandez Renteria*, 971 F.3d 882, 889 (9th Cir. 2020) ("The Jalisco court's statements are inconsistent with the proposition that Bertha had the right, under Mexican law

generally or the Jalisco's court's provisional custody orders specifically, to unilaterally 'take[ ]' or 'subtract[ ]' Z.F.M.Z. from Mexico during her provisional custody period . . . .").

Further, Article 4.204 of the Civil Code of the state of Mexico[9] (the "Code") sets forth that "[p]arental rights is exercised . . . [f]or the father and mother." (ECF No. 40 at 3.[10]) "In case of controversy," the Code states that a "judge will decide [parental rights], considering the interests of the child." (*Id.*) Article 4.205, governing "rights in the event of separation," states that in cases where "there is no agreement on custody, the judge will decide, giving preference to the care of the mother and considering the best interests of the children . . . ." (*Id.*) These provisions thus clarify that both mothers and fathers have custodial rights as to their children under the Code, and any dispute as to custody (including a dispute arising from the separation of the parents) is to be decided by the Mexican judicial system.[11] Because neither parent asserts that a court has definitively determined parental rights as to the three minor children and because the law in the

---

[9] The three minor children were living in the state of Mexico from approximately July 2020 until December 2021, when they were removed to the United States. (*See* ECF No. 37 at 30:8-12, 87:14-88:14.)

[10] Attached to the Petition was an English translation of the Civil Code of the state of Mexico, dated June 24, 2016. (ECF No. 1-2 at 187.) Because of this translation's age, the Court entered an order on May 9, 2023, directing Petitioner to provide by May 19, 2023, a certified English translation of a more recent version of the Code (amended in March 2023). (ECF No. 39.) A copy of the certified English translation was provided on May 22, 2023. (ECF No. 40.) On May 26, 2023, counsel for Respondent wrote to the Court to advise "that the respondent does not object to the certified translation submitted by the petitioner." (ECF No. 43.)

[11] The Court notes that the Convention itself states that judicial bodies "may take notice directly of the law of, and of judicial or administrative decisions, formally recognised or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable." Convention, art. 14; *see also Mar. v. Levine*, 249 F.3d 462, 474 (6th Cir. 2001) ("the treaty sets forth generous rules regarding authentication of documents and judicial notice").

state of Mexico provides both parents with custodial rights unless otherwise decided by a court, this Court must presume that *both* parents, including Godinez, retain their custodial rights.

Such a finding is consistent with what the Court understands to be a prevalent doctrine in Mexican family law, *i.e.*, the doctrine of *patria potestas*, which generally sets forth that both parents acquire parental rights over a child at the moment of birth when paternity is acknowledged. *See, e.g., Garcia v. Pinelo*, 808 F.3d 1158, 1165 (7th Cir. 2015) ("[A] certificate from the Mexican Central Authority stating that '[a]ccording to Mexican Law, individuals acquire parental rights (*patria potestad*) over a child since the moment of birth, or registration before the civil registry as a result of an acknowledgment of paternity.' . . . *Patria potestas* is central to Mexican family law."); *Lieberman v. Tabachnik*, 625 F. Supp. 2d 1109, 1118 (D. Colo. 2008) ("Attorney Katz testified that *patria potestas* is the most sacred concept in Mexican family law. It is the binding relationship between a parent and their minor child until they become emancipated."); *Saldivar v. Rodela*, 879 F. Supp. 2d 610, 624 (W.D. Tex. 2012) ("As with the Federal Civil Code and the civil codes of other Mexican states, . . . the same concept of *patria potestad* comprising a bundle of correlative rights over a minor child. These rights are equally shared by the mother and the father." (citations omitted)).

*Fourth*, and finally, the Court finds that Godinez was exercising his custodial rights at the time of removal. "[T]he test for finding the non-exercise of custody rights under the Hague Convention is stringent." *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005) (*Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996)). "Essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights." *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 277 (3d Cir. 2007) (citing *Baxter*, 423 F.3d at 370). The record before this Court does not suggest that Godinez clearly or unequivocally

abandoned his three children. To the contrary, the testimony and evidence adduced demonstrates that he was involved in their lives and provided varying degrees of financial and parental support. (*See, e.g.*, ECF No. 37 at 20:19-21, 23:2-6 ("Well, we were used to going to the park, to eat together, do homework, play video games with my oldest son J.A.; look at videos, educational videos; and also comics, comic books; on some occasions we'd go to the theater, to the movies."); *see also* P-3.) Indeed, when asked whether she would "acknowledge that Mr. Godinez cared for his children and was involved in their parenting," Morales replied, "Equal parts." (ECF No. 37 at 107:11-13.) And once the children were removed to the United States, Godinez promptly acted in Mexico and the U.S. to try to have them returned. (*See id.* at 24:16-25:7, 94:14-23; P-4 & P5.) Therefore, the record supports the finding that Godinez exercised his custody rights, and he has met his burden of demonstrating a *prima facie* case of wrongful removal under the Convention.

### B. Exception/Affirmative Defense to Return

Where a petitioner has established a *prima facie* case of wrongful removal, the Convention recognizes certain narrow exceptions to the return obligation. *See* 22 U.S.C. § 9001(a)(4) ("Children who are wrongfully removed or retained . . . are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.").

Counsel for Respondent chose not to argue in support of exceptions/affirmative defenses in the post-hearing briefing (*see* ECF No. 35 at 3 n.1), and no evidence was admitted at the hearing that would support the finding that an exception to return is appropriate in this case. Nevertheless, because Morales invoked different defenses in her answer to the Petition as well as in her pre-hearing briefing, the Court will address the main ones. Primarily, Morales avers that, pursuant to Article 13(b) of the Convention, requiring the children to return to Mexico "would have a negative impact on their development, including potential psychological harm," and "would place the

children in an intolerable position." (ECF No. 27 at 3.)

Under Article 13(b), a district court has "the discretion to . . . deny return" where it finds, "by clear and convincing evidence," that there is a "grave risk" that a child's "return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Golan*, 142 S. Ct. at 1892; Convention, art. 13(b); 22 U.S.C. 9003(e)(2)(A). This discretion, however, "is not whim," and a court's judgment must be "guided by sound legal principles." *Golan*, 142 S. Ct. at 1892 (quoting *Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005)). Examples of grave risks and intolerable situations recognized by the Supreme Court include "[s]exual abuse of a child . . . [and] [o]ther physical or psychological abuse, serious neglect, and domestic violence in the home." *Id.*

That said, courts have declined to find "grave risk" sufficient enough to defeat return in instances when there may have been abuse of a parent but no showing that the child has been abused or their well-being jeopardized. *See Monasky*, 140 S. Ct. at 729 ("[T]he District Court credited Monasky's 'deeply troubl[ing]' allegations of her exposure to Taglieri's physical abuse. But the District Court found 'no evidence' that Taglieri ever abused A.M.T. or otherwise disregarded her well-being."); *see also Vera Revelo v. Canizalez Cedeno*, Civ. No. 22-01419, 2022 WL 4009699, at *6 (W.D. La. Sept. 2, 2022) ("[S]poradic or isolated incidents of physical discipline directed at the child, or some limited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." (quoting *Souratgar v. Lee*, 720 F.3d 96, 104 (2d Cir. 2013))); *Munoz v. Diaz*, Civ. No. 22-9, 2022 WL 1093270, at *11 (S.D. Ga. Apr. 12, 2022) ("Domestic abuse or violence directed at a parent may constitute a grave risk, if it is shown, by clear and convincing evidence, that the return would place the children in danger of similar violence.").

Here, Morales testified as to at least two incidents of unacceptable physical abuse that Godinez directed at her, and Godinez acknowledged there were "a couple . . . reports" of domestic violence filed against him, even though they do not appear to have led to prosecution. (*See* ECF No. 37 at 30:13-23.)  At no point, however, was testimony or evidence introduced that suggests that the children had been abused by Godinez or even that they were aware or present for what occurred between Morales and Godinez.  Moreover, no evidence was provided to substantiate Morales's testimony of domestic abuse.  For example, no medical records were proffered and no third-party witnesses were called to testify as to what they may have observed or been contemporaneously told by Morales.  Instead, the third-party testimony of one of the neighbors at Hidalgo 17 as well as the testimony of one of J.A.'s school teachers indicated that the children appeared well cared for while living with Morales and Godinez.  (*Id.* at 69:21-24, 70:4-11, 71:7-13.)  Morales also did not dispute that the children did well in school in Mexico nor did she testify that the children's lives had at any point become "intolerable."

While the Court is sympathetic, it cannot find by clear and convincing evidence that Morales's limited testimony of domestic abuse, standing alone, is sufficient to establish that the children would be at grave risk of physical or psychological harm or otherwise in an intolerable situation if they were returned to Mexico.  Importantly, there is no evidence of any abuse, neglect, or violence directed towards any of the children.  The Court thus declines to exercise its discretion to deny the children's return to Mexico.

Finally, Morales also invokes Article 20 of the Convention to contend that returning the children to Mexico "would offend basic principles of the State of New Jersey related to the protection of human rights and fundamental freedoms." (ECF No. 27 at 3.)  Because Morales never meaningfully explained how the children's return to Mexico would offend human rights or

fundamental freedoms, the Court cannot substantively address it; however, the Court notes that this same argument has been rejected in other cases where children were to be returned from the United States to Mexico. *See, e.g.*, *Gallegos v. Garcia Soto*, Civ. No. 20-92, 2020 WL 2086554, at *8 (W.D. Tex. Apr. 30, 2020); *Rovirosa v. Paetau*, Civ. No. 12-1414, 2012 WL 6087481, at *7 (S.D. Tex. Dec. 6, 2012) ("The 'human rights and fundamental freedoms' exception contained in Article 20 of the Hague Convention does not apply because there is no clear and convincing evidence that returning L.A.V. and M.A.V. to Mexico would oppose principles relating to the protection of human rights and fundamental freedoms.").

## IV.  CONCLUSION

For the reasons set forth herein, and for other good cause shown, the Petition seeking the return of the three minor children J.A., S.D., and E.M. to Mexico is **GRANTED**. An appropriate Order follows.

Dated: May 30, 2023

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE